May it please the court, Halloran Thurman, representing Petitioner, Lival Ward. Your Honors, we have three main issues that we'd like to reiterate from our brief, as well as some clarification on the issues regarding the case law cited. The three main issues in this brief are, first of all, that there were incorrect jury instructions given which deprived, I'm sorry, which relieved the state of proving all elements of a crime beyond reasonable doubt in violation of due process. The second argument is that there was ineffective assistance of counsel due to trial counsel's failure to object to those instructions. And third of all, that there was also ineffective assistance of counsel because trial counsel exacerbated their error of not objecting to the jury instructions by eliciting damaging testimony that was actually inadmissible from a testifying officer, and this exacerbated the instructional error. The first issue is our strongest of two, which is the instructional error. We have actually not found any case directly on point in the Ninth Circuit for this issue. This is the perfect case for precedent on this issue. Contrary to the district court's assessment and also the state's argument, this is not an application of state law. The district court erred in holding, one, that this is not a cognizable habeas claim because it's just a misapplication of state law. That couldn't be further from the truth. The number of cases stating that every element of the crime must be proved beyond reasonable doubt, otherwise it's a violation of due process, there are too many cases to reiterate in this argument. Furthermore, the district court assigned an especially high burden of proof in this case. In doing so, they cited Hendricks v. Vasquez, and they said the burden of proof on a failure to instruct is especially high. Your Honors, this is not a burden of proof. So can we just – I'm struggling with the harmlessness, so I'm willing actually to say, yes, there was an error here in the instruction, but if we say that, let's just say that hypothetically, where's the harm? Because even if they didn't realize that they – even if it was confusing, isn't there just overwhelming evidence here of specific intent? Well, the – What is your evidence? Can you point me to anything in the record that really left there any ambiguity in whether he wanted this person to be killed? It really seems like there was just overwhelming evidence. Well, first of all, I'd just like to reiterate, Corella v. California says that if there is a failure to instruct that constitutes a missing element to the crime, which we argue that this does constitute a missing element to the crime, the jury was supplied with an additional way to find malice, which basically relieves the district attorney of their burden of proof of proving malice, if they're allowed to get – if they're allowed ways to prove it that aren't admissible under state law, under People v. Swan. Corella v. California holds that a missing element cannot be cured by evidence of overwhelming guilt. However, even if there was evidence of overwhelming guilt, we would argue that those elements that were brought up factually in the trial go towards proving implied malice. So, for example, the jury requested 12 copies of the jury instructions. They were specifically told to disregard 521. Okay, so maybe they were confused about the jury instruction. Where is the evidence in this case that he had any possible intent other than this person be killed? Where is the ambiguity? The ambiguity lies in the fact that, first of all, the – as you know, this is based on a series of telephone calls that were talked about in code from jail. Hines – And they were all recorded. They were all recorded, yes, Your Honor. All recorded. Yes, Your Honor. And he was a pimp, and she was one of his girls. Prostitutes, yes, Your Honor. Prostitutes. Yes, Your Honor. And he wanted her killed. That's arguable, Your Honor. Well, that's what they say. And his co-conspirator – If you read the tape, you know, it's what he wanted. He wanted her killed so she wouldn't testify. Yes, Your Honor. That is the – that is one of the implications of the set of facts. And didn't the co-conspirator – However, he said – he practically said that. One of the co-conspirators, Hines, specifically testified in court that she didn't understand everything that Ward wanted carried out during the telephone calls. Furthermore, Joaquez, the conspirator that was alleged to have been instructed to carry it out, was apprehended not even in the act. He was apprehended days before this was supposed to even occur. Do you have any testimony from one of the co-conspirators saying that they believed they were only supposed to scare the victim or that they believed his instructions meant something other than that they were supposed to kill him? I mean, maybe they say, generally, I didn't understand everything. But didn't they basically uniformly say that he wanted them to kill him – kill her, the victim? There was no testimony directly to that fact. The testifying officer actually said, I can't tell – I'm paraphrasing here. He basically said, I can't tell from this set of facts whether or not there was an agreement. And that's where the testimonial error came in. This is what exacerbates the instructional error is trial counsel said, well, didn't you say in prior testimony that you thought there was an agreement? She basically led the testifying officer into testifying that based on this coded language, based on his knowledge of gang activity, based on knowledge of gained in prior law enforcement operations similar to this, that he believed and that he came to the legal conclusion that agreement was, in fact, formed. So it was incredibly ambiguous. And also the language of the jury instructions is also similarly ambiguous. Malice aforethought, it specifically – and I'm paraphrasing here as well – it specifically says that express malice requires an intention to kill. But it also says that implied malice is the intentional commission of an act which is dangerous to human life. And so both of the words are there. Was there an objection to that? I'm sorry. Was there an objection? There was not an objection. That was trial counsel's ineffectiveness there in failing to object to that jury instruction because it basically eliminates the burden of proof on malice to say that you can – intentional commission of an act that is dangerous to human life. All of the facts that he was convicted on basically point toward – it's the definition of express malice. He – the prosecutor stated in his closing argument that Joaques was signed up to do the dirty work because he was the violent one. Now – and they also said that he wanted to intimidate the witness and make it look like a robbery. Did he know when he was making these calls from prison that he was being recorded? No, Your Honor. He did not know when he was making the calls that he was being recorded. And how was he making these calls? Did he have a pay phone there? I'm not familiar with the inner workings of the particular facility where he was incarcerated at the time he made the telephone calls. Well, we can get you a tour there if you'd like one. Okay. So in light of the fact that I don't know that – I'm just wondering because he was kind of stupid, too, to make those phone calls. Well, one of the victims specifically testified that – You have to know that they're all being recorded. It's unclear from the record whether or not he knew he was being recorded. It doesn't say anywhere in there that he knew at the time that he was being recorded, although – He's kind of stupid either way. Yeah. That's just pretty universal knowledge. Well, anyway, I would just really quickly, Your Honors, I would just like to reiterate the facts that basically point towards the fact that the jury – there's a substantial likelihood that they rendered a verdict that was based on implied malice because the prosecutor said in his closing argument that Joaques was – to make it look like a robbery and that he was assigned to do this robbery slash intimidation because he was – But it doesn't matter what Joaques thought, right? If Ward and Hines both thought that the plan was to have this person killed, it doesn't matter if they were using Joaques as a pawn, right? It was arguable as to whether or not the other two conspirators actually thought that Ward wanted the victim dead. And where is the ambiguity in the record there? Can you point to any testimony from Hines that makes it unclear about whether they actually meant for it to be that she was killed? I don't have that handy at the moment, Your Honor, but I do have in my notes that Hines specifically testified that she did not understand everything that Ward wanted carried out, and that is clear from the actions. Joaques, the person instructed to do the burglary, was instructed to make it look like a robbery and to intimidate the witness. There is no indication in any of the tape-recorded telephone calls that they were supposed to actually shoot the victim. All of the other evidence – I mean, that's the definition of implied malice, is sending somebody violent to conduct a robbery. And the district court, if they had looked at it in light of the entire record, would have found that there is a reasonable likelihood that the jury convicted based on a theory of implied malice. The state court of appeal said that the jury – was clear to the jury that they needed to find specific intent. Right, but that does not mean that they couldn't find specific intent from the implied malice because the jury instructions both use the word intent, and actually the instruction for implied malice is much longer, and the jury had 12 copies of that in front of them, and that's clear from the record that they relied heavily on that. But was implied malice argued by the prosecutor? Not specifically, but if you read the closing arguments, it's pretty much the definition of implied malice. Sending somebody who's violent to carry out a robbery is the definition of implied malice. It's an overt act that's dangerous to human life. It's not a specific intent to kill. Okay. And the jury was not instructed specifically on intent to kill either. You owe us 27 seconds. Thank you, Your Honor. I'd like to save – I'll take a minute for rebuttal. Thank you. He'll have to be generous to give it to you. Good morning, Your Honors. May it please the Court, Deputy Attorney General Colette Cavalier for Respondent. In this case, the California courts properly denied relief on both of these claims. And they rely on People v. Swain. But in People v. Swain, the California Supreme Court held that conspiracy – Well, the trial judge wasn't very careful with this. He was not. And there were errors made both in the charging and the instructions given and in some of the evidence that was allowed to come in. But that said, in light of the overwhelming evidence of intent to kill in this case, any of those errors were harmless. Did the state court conduct a harmlessness inquiry? No. What they – yes and no. They found that the jury instructions were not correctly given. In fact, the use notes to CalCrim 563 expressly say, if you are charging this as conspiracy to commit murder, you have to give 520 and 521, but you should remove the reference to – And the trial court got that wrong. They totally overlooked it. They totally overlooked it. Well, what about the prosecutor? He's supposed to be on his toes. It was the jury instructions that the prosecutor submitted, and it was the jury instructions that the defense – Oh, he submitted them both. And there was no defense. Nobody caught this. Nobody caught this, and they should have. But that said, CalCrim – Well, that's because we have the harmless error business. You know, you make a lot of mistakes, but, you know, ha-ha, they're harmless. It doesn't promote a high degree of professionalism. No, and I'm not going to get up here and tell you this is how it should have happened or that it was correct. What I will say is that given the instructions on intent given in CalCrim 563, which does explicitly say – explicitly. It does not omit any elements of the offense. It explicitly says that the defendant and one of the co-conspirators must intend to intentionally and unlawfully kill. And that's the very definition, if you look in 520, of express malice. So the reference to implied malice is really just superfluous in this case. It's not something that the jury could have relied on, especially in light of the arguments given. Defense counsel. So there are two possible ways of thinking maybe of the harmlessness. One is there was an error, but the jury instructions as a whole were not confusing. The other is even if they were confusing, there's overwhelming evidence. I don't actually see either of those in the state opinion. Do you agree, or can you point me to something here? It was not entirely clear how they got to the bottom line. I read it as relying more on the arguments of counsel under Boyd v. California. So in light of the way the evidence was presented. But the arguments of counsel couldn't fix a problem if there was a problem, right? Depends on the problem, but if they had omitted an element of a crime, no. You couldn't have fixed that. Probably could not have fixed that. Here, they were correctly instructed as to the elements of the crime, and that, amplified by the arguments of counsel and the evidence presented, made clear that they had to find, and what the prosecutor argued, was not that Jaquette was acting under an implied malice theory, but that Ward and Hines were the two co-conspirators that had the required intent to kill. But because of how this is written, how the California Court of Appeal decision is written, are we under de novo review on all of this? What's our AEDPA standard here? I'm not sure any of this is actually decided. When you have a state court opinion that's ambiguous, you presume under Williams that it's a silent denial as to the merits of the federal claim, at least. So deference to the outcome, but de novo review of the record to see if that outcome is supported by the record. And I think under that standard, it's clearly a reasonable application of federal law. And you're saying that as to the instruction issue and as to the ineffective assistance issue? Or are you just talking about the instruction issue right now? Just as an instruction issue. I think it's actually the same as to both, but I agree that it's much less clear as to the ineffective assistance of counsel claim where there is no reasoned decision. Anywhere. All you have is a state court decision which only says, oh, these claims were raised. But the IAC claim wasn't raised, so what does that mean? Well, I would set that aside and look solely at the Cal Supreme and the California Court of Appeals because it was not the same claims presented below as it was at the Court of Appeals and the California Supreme Court. But the ineffective assistance claim was the same, wasn't it? It was. At all three levels? Yes. Well, there was additional IAC claims. But the one we're talking about here? Yes. So why shouldn't we view the reasoned decision on the IAC claim as the superior court decision, even if actually the reasoning makes no sense? It's still a reasoned decision, right? You can. There's a presumption from Woodford v. Viciati that the state courts know and apply the law, and it would make no sense for them to apply the law to deny claims because they were already brought on direct appeal that weren't already on direct appeal. So to give the state courts the benefit of the doubt that they applied the law correctly, I think the common sense reading of this is that it's a silent denial on the merits, especially when you look at, and I think it's on page one of the excerpts of the record, the docket shows that the California Supreme Court did not have the appeal court record before them at the time they denied the claim. So if they were going to deny it based on the fact that it had already been raised on appeal, it probably would have been the case that they would have requested the appeal record to see what... So they said that. I didn't realize that. They said that it was already decided on appeal without knowing what was decided on appeal? That's the Superior Court that decided that it was already on appeal. Oh, I see. California Supreme Court just strict silent denial. And I'm saying not having any indication that the appeal record was before them, and in light of the fact that it was only the IAC claims before them, then that should be read as a silent denial on the merits. On the other hand, if you want to say that it is purely procedural and we have no claim on the merits, I don't think that affects the outcome in this case. I do not think that there, even as the ineffective assistance of counsel, that there is any prejudice in this case, even though... Well, all we got here from the state court system was a postcard denial, right? Correct. So it went to the Supreme Court, you get a postcard denial. It goes to the Court of Appeals, you get a postcard denial. It goes to the Superior Court, the trial court, you get a postcard denial. And under Richter, that's enough. Yeah, and then it all gets dumped on the federal system. I mean, what's weird is under, I agree with you, under Richter, if it had just been postcard denials, I would say that we would have to apply deference. But they actually said something in the Superior Court. It's just they said something that was totally wrong. Right. And I think maybe the more natural way of reading what they said was a Clark denial of the claims that were, in fact, raised on direct appeal and a silent denial on the merits as to the other claims. But they didn't say that. But they didn't say that. So why should we even worry about it? They never worried about it. You know, they just, you know, they have all the postcards there already to go out. And that's why I'm saying under either standard. So let's say we're under de novo review. Why do you still win? Because there's no prejudice. The overwhelming evidence at trial was that he intended for Kylie Apostle to be killed and that that was the only way to shut her up and to ensure that she wasn't going to be available. Were the recordings played? The recordings were all played for the jury, and they had transcripts. And, by the way, he did know he was being recorded. You can see in the transcripts in a couple of spots where they broke in and said, you know, this is Riverside Correctional Facility. Your call may be monitored, blah, blah, blah. He didn't believe that. He thought maybe he could get away with it. That's why the speaking in code and all of the secret language that they used was so critical. He thought he was sneaky enough to get all this by. Even if it was recorded and somebody actually was listening to it, it would still flip out. He was a genius. Exactly. Okay, thank you. All right. Thank you. All right. You've got one minute. Your Honors, first of all, I would like to address the issue of harmless error. Yates v. Evitz holds that unconstitutional jury instructions on malice cannot be excused as harmless error. We've already discussed the fact that if there's an error that relieves the burden of proof on an element, that it cannot be cured by overwhelming evidence of the record. The Boyd v. California case does not necessarily control, contrary to the state's argument in their brief, we are not required to prove that there was constitutional evidence that was not considered as a result of the instruction because Boyd v. California dealt with a jury instruction that was said to have been ambiguous at sentencing, and so the jury was said to have not been able to consider all of the mitigating factors. So Boyd v. California is not necessarily in control here, but it is more closely on point than Hendricks v. Vasquez in the sense that the instructions were ambiguous. Okay. Thank you. Thank you. Right on time. All right. Now, let's see. Okay, now we come.
judges: Schroeder, Pregerson, Friedland